# IN THE SUPREME COURT OF IOWA

No. 08–1214

Filed February 20, 2009

**IOWA SUPREME COURT ATTORNEY
DISCIPLINARY BOARD,**

Complainant,

vs.

**JAMES P. BARRY,**

Respondent.

On review of the report of the Grievance Commission.

A majority of the Iowa Supreme Court Grievance Commission recommends an eighteen-month suspension of respondent's license to practice law in this state. **LICENSE SUSPENDED.**

Charles L. Harrington and Wendell J. Harms, Des Moines, for complainant.

James P. Barry, Muscatine, pro se.

**WIGGINS, Justice.**

This case involves a disciplinary action against attorney James Barry for his conduct as the Cass County attorney. The Iowa Supreme Court Attorney Disciplinary Board filed a complaint against Barry with the Grievance Commission of the Iowa Supreme Court alleging Barry committed various violations of the Iowa Code of Professional Responsibility for Lawyers.[1] The Commission found Barry's conduct violated numerous provisions of the Iowa Code of Professional Responsibility for Lawyers. A majority of the Commission members recommended we suspend Barry's license to practice law indefinitely with no possibility of reinstatement for a period of eighteen months.[2]

Because we find Barry's conduct violated numerous provisions of the Iowa Code of Professional Responsibility for Lawyers, we suspend Barry's license to practice law indefinitely with no possibility of reinstatement for a period of one year.

## I. Scope of Review.

Our review of a report filed by the Commission is de novo. *See* Iowa Ct. R. 35.10(1). "Under this standard of review, we give weight to the factual findings of the Commission, especially with respect to witness credibility, but we find the facts anew." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman,* 674 N.W.2d 129, 131 (Iowa 2004). The Board must prove ethical violations by a convincing preponderance of the evidence. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Walker,* 712 N.W.2d 683, 684 (Iowa 2006). " 'This burden of proof is greater than that in a

---

[1]The Iowa Rules of Professional Conduct replaced the Iowa Code of Professional Responsibility for Lawyers on July 1, 2005. All of Barry's alleged violations occurred prior to July 1, 2005.

[2]One member of the Commission recommended Barry receive a public reprimand.

civil case but less than that in a criminal case.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Zenor*, 707 N.W.2d 176, 178 (Iowa 2005) (citation omitted). Although we consider the Commission's recommended sanction, we make the final decision regarding the appropriate discipline. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Curtis*, 749 N.W.2d 694, 697 (Iowa 2008).

## II. De Novo Fact Finding.

We make the following findings of fact on our de novo review of the record. Barry graduated from Washington University Law School in 1986. He was licensed to practice law in Missouri and has maintained that license. Barry received his Iowa law license in January 1987. Barry moved to Cass County to take a position as assistant county attorney in fall 1986, but did not start until he received his Iowa license. In 1990, Barry ran for, and was elected, Cass County Attorney.

In January 2003, Barry's position as county attorney became full-time, which meant he could no longer continue the private practice of law. He remained the full-time county attorney until the Iowa District Court for Cass County removed Barry from office after finding he breached his duties knowingly and with a purpose to do wrong.

After his removal from office, Barry worked for Signature Management Company based in the Quad Cities. He left that position in March 2007. Now, he works for Hoffman, Inc. out of Muscatine. Since the district court's ruling, Barry has not engaged in the private practice of law in an office, but has done some work on legal matters with both companies. His current position does not require a law license, but it has been useful in some instances.

Barry has been involved in two previous disciplinary actions. In the most recent disciplinary action, Barry appeared in court to prosecute

a client of one of his law partners. Because Barry was unaware of the conflict, the Board issued him a private admonition. In the other disciplinary action, Barry received a public reprimand for reducing speeding charges to permit pleas to offenses that had no factual bases.

As to each count of the complaint, we find the facts as follows.

**A. Count I—Cathy A. Prosecution.** In November 2002, Barry prosecuted Cathy for possession of marijuana. She pled guilty. The court gave her a deferred judgment, placed her on unsupervised probation, and ordered her to do forty hours of community service. During the time Cathy was required to complete her community service, she became pregnant and felt she could not complete her community service.

In a letter dated December 23, 2003, Barry stated in lieu of community service Cathy could pay a $400 donation to the Cass County sheriff's office. That letter also stated if she did not make the donation, Barry would file a probation violation. Cathy made the donation to the sheriff's office. Barry then had a judge sign an order eliminating community service from her sentence.

At the time Barry negotiated this deal, the Iowa Code allowed a donation of property to a charitable organization in satisfaction of part or all of a defendant's community service obligation. Iowa Code § 907.13(2) (2001). The Code specifically prohibited a donation to a governmental subdivision, such as the sheriff's office. *Id.*

**B. Count II—Ronnie E. Prosecution.** In November 2003, Barry charged Ronnie with drug-related felonies and misdemeanors. At Ronnie's arrest, law enforcement took his truck, CB radios, and other items. The Cass County sheriff filed a notice of forfeiture of the seized items pursuant to Iowa Code section 809A.6(5). Forfeited property is

deemed to be in the custody of the district court subject to orders and decrees of the court and to the acts of the seizing agency or prosecuting attorney as authorized by chapter 809A. *Id.* § 809A.7(4) (2003). The prosecuting attorney may authorize the release of the property if forfeiture is unnecessary. *Id.* § 809A.7(2).

In December, Ronnie applied for the return of his property. Barry told Ronnie that if he donated $500 to the Cass County sheriff's office, he would receive his truck back. Ronnie paid the donation, and his truck was returned.

The court eventually issued an order forfeiting the $500 rather than the truck. The $500 was retained by the sheriff's office. Under Iowa law all forfeited property not needed as evidence must be turned over to the attorney general or the attorney general's designee, unless the attorney general or the attorney general's designee orders the property destroyed, sold, or delivered to another agency. *Id.* § 809A.17(2). The attorney general never authorized the $500 to be retained by the sheriff's office.

**C. Count III—Hans K. Prosecution.** In June 2003, Barry charged Hans with an OWI in Cass County. Hans pled guilty to OWI, was given a deferred judgment, and placed on probation under the supervision of the Cass County attorney's office for six months. Hans was also required to pay a $200 probationary fee to the clerk of court. In the county's records, the county recorded this fee as income generated by the county attorney's office, with the revenue going to the general fund of the county. The Iowa Code authorized a $250 probation fee if the person placed on probation was under the supervision of a judicial district department of correctional services established under Code section 905.2. *Id.* § 905.14(1). There is no provision for a person to pay a fee to

the county attorney for providing probationary services. *See also Kragnes v. City of Des Moines*, 714 N.W.2d 632, 642 (Iowa 2006) (holding any fees charged by a city must be reasonably related to the city's administrative expenses in the exercise of its police power).

Hans later received a minor-in-possession-of-alcohol charge in Cedar Falls in October 2003. As the probation officer, Barry was required to bring the defendant before the court if he had probable cause to believe that Hans violated the terms of his probation. Iowa Code § 908.11(1). It would then be up to the court to determine if a violation occurred and the appropriate sanction for the violation. *Id.* § 908.11(4). Instead of bringing the violation to the attention of the court, Barry agreed to disregard the violation if Hans donated $250 to the Cass County sheriff's office. Barry admitted and we agree that if he had brought the probation violation to the court as provided by law, he would have been a potential witness for the State in the probation matter. Even with this conflict he failed to withdraw from the case and proceeded to negotiate a deal so Hans could avoid a probation revocation proceeding.

**D.  Count IV—Charles M. Prosecution.**  Barry charged Charles with domestic abuse assault in July 2003. Charles pled guilty to the charge, and the court placed him on unsupervised probation. Under federal law, a person convicted of domestic assault cannot possess firearms. 18 U.S.C. § 922(g)(9). The Cass County sheriff's office seized thirty-four guns and ammunition from Charles. The seizure reports did not mention the ammunition.

Originally, the seized items were in the sheriff's office area, but were then moved to storage. The deputy sheriff, Darby McLaren, said there was ammunition in the evidence room at the time, but it was not tagged, so no one was aware that the ammunition was part of the list of

items seized from Charles' house. McLaren further added that because the ammunition was not evidence and was not tagged, it was considered sheriff's property. Barry saw the untagged ammunition and asked McLaren about it. McLaren later delivered the ammunition to Barry for his use.

Charles sold all of his weapons to his father, Larry, so his father could claim the firearms. Larry asked for the ammunition and the firearms. When Larry received the seized firearms, he claimed someone had fired three of the guns. Larry also claimed the sheriff's office did not return all the ammunition.

Barry stated that although he had the ammunition, he did not use it, and returned it once he realized his possession of weapons and ammunition would be a source of contention in the upcoming sheriff's election. Barry further admitted he knew at the time that under Iowa law all firearms and ammunition should have gone to the state division of criminal investigation to be disposed of as provided by law. Iowa Code § 809A.17(5)(*b*); Iowa Admin. Code r. 661—4.52 (2003). In spite of his knowledge of the law that required firearms and ammunition to be sent to the state division of criminal investigation, Barry believed the division of criminal investigation allowed the sheriff's office to keep the weapons and ammunition and destroy them unless the State needed them as evidence for some reason.

**E. Count V—Craig B. Prosecution.** On August 11, 2003, Craig was charged with three counts of supplying alcohol to minors, a serious misdemeanor. He decided to plead guilty to one count of supplying alcohol in return for a deferred judgment and unsupervised probation, with Barry as his probation officer. Craig was assessed a $200

probationary fee payable to the clerk of court. Craig also donated $500 to the Cass County sheriff's office as part of his plea agreement.

**F. Count VI—Meagan M. Prosecution.** Barry charged Meagan with driving with a suspended license on October 22, 2003. Her attorney told her she could either lose her license, which she needed for her job, and pay $1000, or under a plea agreement he made with Barry, she could pay $147, keep her license, and make a $200 contribution to the sheriff's office. She agreed to pay the fine and the contribution to the Cass County sheriff's office. To facilitate the plea, Barry amended Meagan's driving-under-suspension charge to driving without a license.

**G. Count VII—David J. Prosecution.** Barry charged David with domestic assault in August 1999. At that time, the sheriff seized David's firearms. David pled guilty to a simple assault, and his weapons were returned. In December 2003, after Deputy McLaren had seen David hunting, the sheriff's office executed a search warrant and took the guns and ammunition David had in his house. Barry asserted that David's prior conviction for assault precluded him from possessing firearms.

David made a claim on behalf of his wife and kids for the property seized. Barry offered to return the guns in exchange for a $500 donation to the Cass County sheriff's office, an offer David accepted. David received the guns in February 2003, and later the court issued an order saying there was no probable cause for forfeiture of the property. The court subsequently issued an order nunc pro tunc adding the $500 donation to the order.

**H. Count VIII—Timothy S. Prosecution.** Barry charged Timothy with driving with a suspended license in December 2003. Timothy's father called Barry about the citation. Barry agreed to amend Timothy's citation to driving without a driver's license as long as Timothy paid a

$100 fine and donated $250 to the Cass County sheriff's office. The court order finding Timothy guilty of the lesser charge did not reflect the donation.

**I.  Count IX—Sheriff's Drug Fund.**  The sheriff's drug fund existed long before Barry became county attorney.  Prior to Barry allowing contributions to the sheriff's office, the sheriff's office had a line-item budget expense in the county's budget for the drug fund.  The purpose of the fund was to have cash readily available to the sheriff's office twenty-four hours a day, seven days a week if they needed to make a drug buy or pay an informant.  The supervisors authorized the cash fund to contain $500.  As the sheriff depleted the fund, the sheriff would go to the board of supervisors to replenish the fund.

The sheriff discontinued asking the board of supervisors to finance the fund when Barry began making plea bargains with defendants to donate to the fund as part of plea agreements.  The sheriff used the donations to finance the fund.

Barry stated he knew of the drug fund throughout his tenure. Barry first saw the drug fund ledger in December 2003.  When Barry saw the drug fund ledger, he told the sheriff the ledger should be monitored and independently verified.  At that point, he placed Stephanie Witzman, a civil process server in the sheriff's department, in charge of the fund. In January 2004, Witzman completed her first accounting, which showed a balance of $13,000.  Barry signed off on this accounting.

Around February 10, 2004, Larry Jones, the Cass County sheriff, and Barry asked Witzman to update the drug fund records from November 2003 to present because a reporter from the *Des Moines Register* was asking to see the ledger. Witzman ran into problems when updating the ledger because the fund was short approximately $3000.

Deputy McLaren later helped Witzman with the accounting and resolved several of the discrepancies. One discrepancy was that the money for the purchase of a Sako rifle came out of the drug fund, and Deputy McLaren forgot to report it.

In late February 2004, Barry claims he first learned the county auditor was not auditing or managing the fund. On February 25, Barry called for a state audit of the fund. The sheriff then turned the drug fund over to the county treasurer. Barry admitted he did not tell the sheriff's office to send this money to the county treasurer until late February when the story broke in the *Des Moines Register*.

In addition to making drug buys, paying informants, and purchasing weapons, the sheriff used the drug fund to pay Barry's cell phone. Moreover, money from the drug fund was going to be used to purchase a vehicle for Barry.

The money going into the fund was coming from donations by defendants as well as forfeitures. Barry admitted he knew at the time the court forfeited property, including cash, that he should have sent the property to the attorney general or the attorney general's designee, unless the attorney general or the attorney general's designee ordered the property destroyed, sold, or delivered to another agency. This admission confirms Barry knew he was violating the law by not complying with Code section 809A.17(2). As an excuse for his violation of the law, Barry stated:

> I'm aware of where the funds are supposed to go. I'm aware of what's supposed to happen with probation violations. I'm aware of a lot of laws that whether we like it or not aren't enforced by the letter. Does that make them right or wrong? Just you need to understand that we can talk about it in finite terms, but it didn't exist in finite terms.

**J. Count X—Unsupervised Probation.** Beginning in 2003, Barry started the unsupervised probation process in which the county attorney acted as the supervising officer. He obtained approval from the board of supervisors and discussed the plan with the chief judge and the district court judges. In these cases, Barry acted as probation officer, but did not remove himself as the county attorney.

Barry estimated he had acted as probation officer in around one hundred cases by court order, and another fifty informally. In about fifty of those cases, there would have been applications to revoke probation. As probation officer, he had the duty to bring probation violations to the attention of the court. Iowa Code § 908.11(1). In all the cases where revocation hearings were scheduled, he could have been a witness, yet he never withdrew as counsel for the State or county.

**K. Count XI—Sako Rifle.** The Board alleged that Barry had the sheriff's office purchase a Sako rifle for his personal use from the drug fund. Although the Board established the rifle was purchased from the drug fund, it failed to prove by a convincing preponderance of the evidence that the rifle was purchased for Barry's personal use.

**L. Counts XII and XIII—Possession and Return of the Sheriff's Firearm and Ammunition.** Barry first received authorization to possess firearms and ammunition from the sheriff's office in 1991. Barry shot pistols and machine guns. Some weapons he had were forfeited, others were seized. Barry admitted his use of the guns and ammunition was not appropriate, and was illegal under the laws that dictate the disposal of forfeited and seized firearms. *See* Iowa Code § 809A.17(5)(*b*); Iowa Admin. Code r. 661—4.52. Under the law, the forfeited weapons and ammunition were supposed to be sent to the department of criminal investigation for disposal. Barry never removed the weapons from the

sheriff's office himself, but he had them delivered to him by sheriff's office personnel. Barry was the only civilian that was given access to the weapons.

In February 2004 after the media began investigating his office, Barry returned ten weapons to the sheriff's office. Barry stated he did not want the deputy to come to his house to pick up the weapons because he was afraid the media would be there and he did not want his family involved. Barry met Deputy McLaren at a location other than his house to return the firearms and ammunition that he had in his possession.

**M. Count XIV—1998 Tahoe Vehicle.** When Barry became the full-time county attorney, the board agreed it would provide him with a vehicle for his use. First, Barry drove an old squad car, then a forfeited Grand Am. These vehicles were old and unreliable. In December 2003, Barry asked the board of supervisors about obtaining another vehicle, but there was not another squad car or forfeited car available. The supervisors expressed reluctance about buying a vehicle for him; however, the supervisors realized Sheriff Jones and Barry were looking for a vehicle. Jones and Barry went online, found a 1998 Chevy Tahoe in Texas, and purchased the vehicle for $12,726.

Barry filled out a claim form to obtain $3000 from his office for the vehicle. The remaining $9,726 was to come from the drug fund. Barry's claim for $3000 was initially granted, but later voided when the chairman of the board of supervisors reviewed the claim. The sheriff, however, did buy the truck, without the board's permission and without Barry's knowledge. Barry never actually used the Tahoe.

### III. Violations.

The Board charged Barry with multiple violations of the Iowa Code of Professional Responsibility for Lawyers. Although the Commission found the Board proved all of the violations as charged, we find Barry only violated the following provisions of the Iowa Code of Professional Responsibility for Lawyers.

**A. DR 1–102(5).** This rule prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice. Iowa Code of Prof'l Responsibility DR 1–102(5). The Board is not required to prove intent, knowledge, or motive to establish a violation of this rule. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Borth*, 728 N.W.2d 205, 210 (Iowa 2007). There is no typical conduct that prejudices the administration of justice. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Steffes*, 588 N.W.2d 121, 123 (Iowa 1999).

The common thread running through our decisions finding a violation of DR 1–102(5) is that "the attorney's act hampered the efficient and proper operation of the courts or of ancillary systems upon which the courts rely." *Id.* This rule "focuses attention on the impact of such behavior upon the parties and the public in terms of their confidence in the justice system." 16 Gregory C. Sisk & Mark S. Cady, Iowa Practice Series Lawyer & Judicial Ethics § 12:4(d)(1), at 1087 (2007 ed.).

Barry's conduct in making illegal plea agreements gave the appearance to the public that justice was for sale in Cass County. All of his illegal plea agreements involved donations to a fund in the sheriff's office. The sheriff used the fund to purchase weapons for the department, to pay Barry's cell phone bills, and to purchase a vehicle for Barry's use. Barry and the sheriff also used firearms seized by the court,

instead of turning the seized firearms over to the proper authorities for disposal.

Barry admitted he knew at the time he forfeited or seized firearms and ammunition the law required forfeited or seized firearms and ammunition to be sent to the department of criminal investigation for disposal. He also admitted he knew at the time he forfeited property other than ammunition or firearms, the law required the forfeited property to be sent to the attorney general for disposition. Items forfeited were sent to the sheriff's office rather than being disposed of properly under the law.

Finally, Barry acted as prosecutor and probation officer. In his capacity as probation officer, he had a duty to report violations to the court so the court could determine whether to revoke a defendant's probation. Instead of reporting known violations to the court, Barry allowed violators to contribute to the sheriff's office to avoid a revocation of probation.

In his defense, Barry contends that judges approved his actions in giving the donations to the sheriff's fund, defense attorneys allowed their clients to make those donations, and other counties had the same type of system for donations and unsupervised probation. However, under similar circumstances, we have said that despite the agreement and cooperation of other prosecutors, judges, and the clerk's office, that respondent could not "avoid the prejudice to the administration of justice inherent in [his] action." *Borth*, 728 N.W.2d at 210–11.

The business of the courts is to administer justice fairly, impartially, and in a manner consistent with the statutes enacted by our legislature. The legislature only allowed donations to charitable organizations under limited circumstances, set up a system to dispose of

forfeited and seized property, and set up a probation system requiring probation officers to report violations to the court. Our system of justice is not set up to finance the operation of the county attorney or the sheriff's office.

Barry prejudiced the administration of justice by disregarding the laws regarding charitable contributions, forfeiture, and probation to fund expenditures made for the county attorney and sheriff's office. Barry's actions hampered the efficient and proper operation of the courts and the probation systems upon which the courts rely. His conduct lessened the public's confidence in our system of justice. Accordingly, we find Barry violated DR 1–102(5).

**B. DR 1–102(6).** This rule prohibits an attorney from engaging in conduct that adversely reflects on the fitness to practice law. Iowa Code of Prof'l Responsibility DR 1–102(6). This rule has no intent requirement, but instead focuses on the attorney's conduct. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kress*, 747 N.W.2d 530, 539 (Iowa 2008). The term fitness not only includes an attorney's legal competency, but also an attorney's " 'character' " and " 'suitability to act as an officer of the court.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weaver*, 750 N.W.2d 71, 79 (Iowa 2008) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford*, 625 N.W.2d 672, 683 (Iowa 2001)).

To find a violation of DR 1–102(6) we look to the attorney's conduct and the surrounding circumstances. *Id.* Conduct that adversely reflects on the fitness to practice law "focuses on matters that 'lessen[] public confidence in the legal profession.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Johnston*, 732 N.W.2d 448, 454 (Iowa 2007) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Marcucci*, 543 N.W.2d 879, 882 (Iowa 1996)).

Barry's conduct as a full-time county attorney resulted in a diminishment of public confidence. Even persons who were receiving favorable treatment questioned Barry's sense of justice. Ultimately, this conduct led to Barry's removal from office for knowingly breaching his duties as county attorney with a purpose to do wrong. Instead of serving the people honorably, he chose to engage in conduct involving questionable practices. This conduct was not isolated but permeated all aspects of his tenure as full-time county attorney. For these reasons, we find Barry's conduct reflects adversely on his fitness to practice law.

**C. DR 7–102(A)(8).** This rule states that in the representation of a client a lawyer shall not "[k]nowingly engage in other illegal conduct or conduct contrary to a disciplinary rule." Iowa Code of Prof'l Responsibility DR 7–102(A)(8). The Iowa Code of Professional Responsibility did not provide a definition of "knowingly." The newly enacted Iowa Rules of Professional Conduct, however, do define "knowingly," but not in the context of this rule. The Iowa Rules of Professional Conduct state that knowingly "denotes actual knowledge of the fact in question. A person's knowledge may be inferred from the circumstances." Iowa R. of Prof'l Conduct 1.0(f). Proving a person's state of mind is difficult. Most often, the trier of fact must infer a person's knowledge from the evidence presented. In regards to inferring a lawyer's knowledge it has been said,

> As noted earlier in this section, the law of lawyering as set forth in Model Rule 1.0 permits a disciplinary authority to "infer from circumstances" that a lawyer knows what a reasonable person would know. More than this, the law takes account of a lawyer's legal training and experience in assessing his or her state of mind. A lawyer is an adult, a man or woman of the world, not a child. He or she is also better educated than most people, more sophisticated and more sharply sensitized to the legal implications of a

situation. The law will make inferences as to a lawyer's knowledge with those considerations in mind.

1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 1.23, at 1-46 (3d ed. 2005-2 Supp.).

The definition of "knowingly" contained in the Iowa Rules of Professional Conduct is consistent with prior pronouncements of this court dealing with the liability of a lawyer under Iowa's consumer protection law. *See State ex rel. Miller v. Rahmani*, 472 N.W.2d 254, 258–59 (Iowa 1991) (holding a lawyer could not be held liable under consumer-protection laws where lawyer was unaware of client's fraud or of use to which client would put brochures impounded by postal authorities after release obtained through lawyer's efforts). This definition is also consistent with another state's interpretation of DR 7–102(A)(8). *See In re Harrington*, 718 P.2d 725, 734 (Or. 1986) (holding a lawyer cannot be disciplined under DR 7–102(A)(8) where lawyer who distributed funds without first securing an order of the probate court was not shown to have known that his conduct was illegal). Accordingly, "knowingly" under DR 7–102(A)(8) requires actual knowledge of the fact in question and that an attorney's knowledge may be inferred from the circumstances.

Barry admitted he knew at the time he forfeited or seized firearms and ammunition the law required the forfeited or seized firearms and ammunition to be sent to the department of criminal investigation for disposal. He also admitted he knew at the time he forfeited property other than ammunition or firearms, the law required the forfeited property to be sent to the attorney general for disposition. These admissions indicate Barry knowingly violated Iowa statutes as to forfeited property.

Barry further admitted that during his tenure as county attorney, he knew the law required the county auditor to audit the sheriff's drug fund. He claims that he was unaware the fund was not being audited by the auditor until February 2004. We find Barry's testimony not to be credible.

In December 2003 and January 2004, Barry reviewed the ledger of the drug fund. On both occasions he saw that the records of the fund were in disarray and incomplete. By his examination of the ledger, he had to know the county auditor was not auditing the fund. In fact, instead of getting the auditor involved to reconcile the fund, he had a person in the sheriff's office attempt to do so. Barry then signed off on the reconciliation. Therefore, we find Barry knew the county auditor should have audited the fund as early as December 2003, and yet Barry participated with the sheriff's office in its failure to disclose the fund to the county auditor until late February 2004. For these reasons, we find Barry knowingly engaged in other illegal conduct.

We do not find such a violation regarding the illegal plea agreements made by Barry that required contributions to the sheriff's drug fund. Barry testified he did not know that the plea agreements he made violated the Code provision that only allowed charitable contributions in lieu of community service and specifically prohibited contributions to political subdivisions. A violation of DR 7–102(A)(8) requires that an attorney have actual knowledge. Although we may infer an attorney's actual knowledge from the circumstances, the actual knowledge requirement of DR 7–102(A)(8) is not satisfied solely by the maxim, everyone is presumed to know the law. *See Diehl v. Diehl*, 421 N.W.2d 884, 888 (Iowa 1988) (indicating actual knowledge of violating

the law requires more than just showing the law prohibited the conduct and that the person should have been aware of the law).

It is true as a county attorney Barry should have known it was illegal to make plea agreements with donations to the sheriff's office. This alone will not satisfy the knowledge requirement of DR 7–102(A)(8). The Board did not introduce evidence showing Barry had actual knowledge of the illegality of his plea agreements, other than the fact that he made those agreements. The court participated in each agreement by entering orders when requested to do so to confirm such contributions. No judicial officer ever indicated to Barry that his conduct was illegal. Accordingly, the Board did not prove by a convincing preponderance of the evidence that Barry had actual knowledge his actions in this regard were illegal. Consequently, under this record, we cannot find the Board proved Barry's knowledge of his violation of the law regarding charitable contributions by a convincing preponderance of the evidence.

**IV. Sanction.**

We consider many factors when we determine the appropriate sanction a lawyer must face as a result of his or her misconduct. In this regard we have said:

> The goal of the Code of Professional Responsibility is "to maintain public confidence in the legal profession as well as to provide a policing mechanism for poor lawyering." When deciding on an appropriate sanction for an attorney's misconduct, we consider "the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and [the court's] duty to uphold the integrity of the profession in the eyes of the public." We also consider aggravating and mitigating circumstances present in the disciplinary action.

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Honken*, 688 N.W.2d 812, 820 (Iowa 2004) (alteration in original) (citations omitted).

Barry's prior disciplinary history is one aggravating factor we must consider. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Tompkins*, 733 N.W.2d 661, 670 (Iowa 2007).

Barry maintains a mitigating factor is that his conduct was commonplace and done in the open with no one objecting to that conduct. During his testimony Barry addressed the Board's concern about his actions by saying:

> You may not like it, and it may not be the way you would do it, and it may not be the letter of the law, but it was what was happening. No excuses from me against judges or defense attorneys or board members or anybody else because I'm responsible for my actions. I understand that. But to sit here and act like I was some wild cowboy ignoring the law and just doing whatever it was I wanted to do isn't a fair characterization of the situation, I don't think.

Even if Barry's conduct was commonplace, we have said that is not a mitigating circumstance. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 380 (Iowa 2005).

The dissenting commissioner argued that Barry's removal from office and likelihood he is finished as a prosecutor is punishment enough. However, we have stated punishment by a criminal court does not mitigate the need for professional sanctions. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Vinyard*, 656 N.W.2d 127, 131 (Iowa 2003). Likewise, Barry's removal as Cass County Attorney does not provide a basis to reduce the disciplinary sanction that is otherwise warranted.

Finally, in fashioning a sanction, we must protect the public, deter similar misconduct by others, and uphold the integrity of the profession in the eyes of the public. Barry's actions not only violated the rules, but brought the entire system of justice into disrepute. When dealing with Barry, the public's perception was that Barry operated the county attorney's office as though justice was for sale. As one person who made

a plea agreement with Barry stated: "I thought this was a pretty sweet way to do justice. I mean, it was quick and efficient and more in my world of business than what I think of as, you know, the court system."

The public should not view its dealing with our court system as a mere business deal, where those with money and power obtain "sweeter" justice than the powerless or the poor. Justice requires that all persons who appear before our courts be treated fairly under the law. This means a prosecutor should enforce the law as enacted by the legislature, rather than pervert the law for expediency or his or her own purposes. One of our goals in determining the appropriate sanction is to protect our system of justice. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bell*, 650 N.W.2d 648, 652 (Iowa 2002). Our judges and lawyers should work together to apply the statutes as intended by the legislature and ensure justice is administered impartially with integrity. Anything less is unacceptable.

Considering the nature of Barry's violations, deterrence of similar misconduct by others, Barry's fitness to practice, our duty to uphold the integrity of the profession in the eyes of the public, and aggravating circumstances, we conclude the appropriate sanction for Barry's conduct is indefinite suspension with no possibility of reinstatement for one year.

## V. Disposition.

We suspend Barry's license to practice law in this state indefinitely with no possibility of reinstatement for one year. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 35.12. Upon any application for reinstatement, Barry must establish that he has not practiced law during the suspension period and has complied in all ways with the requirements of Iowa Court Rule 35.13. Barry shall also comply

with the notification requirements of Iowa Court Rule 35.22.  We tax the costs of this action to Barry pursuant to Iowa Court Rule 35.26.

**LICENSE SUSPENDED.**