# IN THE SUPREME COURT OF IOWA

No. 13–1029

Filed November 22, 2013

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**MARC R. ENGELMANN,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission reports respondent committed ethical violations and recommends suspension of his license to practice law. **LICENSE REVOKED**.

Charles L. Harrington and Wendell J. Harms, Des Moines, for complainant.

David R. Treimer, Davenport, for respondent.

**WATERMAN, Justice.**

Marc R. Engelmann, an experienced real estate attorney, is serving a three-year sentence in federal prison after a jury convicted him on nine felony counts, alleging bank fraud, wire fraud, and conspiracy. His convictions were affirmed on appeal. He represented a seller in nine real estate transactions in which he submitted HUD-1 statements that falsely overstated the sales prices in order to secure inflated mortgage loans. The jury found he "act[ed] knowingly and with intent to deceive [the lenders] for the purpose of causing some financial loss, loss of property or property rights, or . . . detriment." The lenders suffered losses of $392,937.73, which Engelmann was ordered to pay in restitution. Disciplinary proceedings were held in abeyance pending resolution of his criminal appeal. His license to practice law has been under temporary suspension.

The Iowa Supreme Court Attorney Disciplinary Board brought a complaint against Engelmann, alleging he committed multiple violations of the Iowa Rules of Professional Conduct during these nine transactions. The Board recommended revocation, and Engelmann, through counsel, offered to "surrender his license" if his convictions were affirmed. A division of the Grievance Commission of the Supreme Court of Iowa found Engelmann violated the rules as charged and, after considering his temporary suspension and thirty-six-month prison sentence, recommended an additional six-month disciplinary suspension. For the reasons explained below, we revoke his license to practice law.

## I. Scope of Review.

Our review of attorney disciplinary proceedings is de novo. Iowa Ct. R. 35.11(1). The burden is on the Board to prove attorney misconduct by a convincing preponderance of the evidence. *Iowa*

*Supreme Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 860, 864 (Iowa 2010). "This burden is less than proof beyond a reasonable doubt, but more than the preponderance standard required in the usual civil case." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 142 (Iowa 2004). We respectfully consider the commission's findings and recommendations, but are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 171 (Iowa 2013). If we find a violation, we "may impose a lesser or greater sanction than the discipline recommended by the grievance commission." Iowa Ct. R. 35.11(1).

## II. Background Facts and Proceedings.

Engelmann has been practicing law in the Quad Cities since graduating from law school in 1976. He started with a general practice, but became increasingly focused on real estate law. Several decades ago, the Iowa Title Guaranty Division certified Engelmann to write title guarantees and generate abstracts. Engelmann primarily represented lenders, and this area of his practice thrived. He represented up to twenty lenders in real estate closings, including Wells Fargo Bank, Valley Bank, Quad City Bank, and First Central State Bank. Engelmann also represented buyers and sellers. By 2006, eighty percent of his practice was real estate related. In one two-month period that year, Engelmann represented lenders at over fifty closings and represented buyers or sellers at another fifty closings. By the time of the misconduct at issue, he had practiced law for three decades with an unblemished record and had closed thousands of real estate transactions for his clients.

Engelmann was among the many casualties of the market crash in 2008, after purchasers of real estate sold by his clients defaulted on nine mortgage loans he helped obtain through fraud. On May 17, 2011,

federal prosecutors filed a nine-count felony criminal indictment against him, alleging one count of conspiracy to commit bank fraud or wire fraud, two counts of bank fraud, and six counts of wire fraud. He pled not guilty, and his case proceeded to a jury trial. The federal district court summarized the evidence presented at trial:

> Defendant is an attorney in the Quad Cities area and represented James Laures (Laures) in the mortgage closings of at least nine residential properties. The transactions involved Laures as seller and Robert Herdrich (Herdrich) and Darryl Hanneken (Hanneken) as buyers. The parties agreed upon the purchase price for each property, but also agreed to list on the loan documents an inflated price of between $30,000 and $35,000 more than the actual purchase price for each property. The various lenders then loaned Herdrich and Hanneken money for the transaction based on the inflated price listed on the loan documents. Laures received the inflated price for each sale and then returned approximately $30,000 for each property to Herdrich and Hanneken after each closing as a "kickback."
>
> Defendant admits he knew about the two different prices and that Laures returned money to the buyers. Defendant also knew that the inflated price was not being listed on the HUD–1 forms that were submitted to the lenders. Government witnesses testified that Defendant never disclosed the inflated price or the kickbacks to the lenders or the closing company, Excel Title. Defendant's assistant, Cathy Gockel, testified that Defendant instructed her not to disclose the inflated price or kickbacks to Excel Title. FBI Special Agents Jeff Huber (SA Huber) and Jim McMillan (SA McMillan) testified that Defendant admitted during an interview that the lenders did not know about the inflated price or the kickbacks. Defendant, however, testified that Excel Title was aware of the dual prices and kickbacks because Defendant had disclosed that information to Excel Title and believed that Excel Title would have informed the lenders of this information, and, therefore, he had no intent to defraud.

*United States v. Engelmann*, 827 F. Supp. 2d 985, 987 (S.D. Iowa 2011), *vacated in part*, 701 F.3d 874 (8th Cir. 2012), *aff'd after remand*, 720 F.3d 1005 (8th Cir. 2013). Engelmann charged a $350 fee for each of the nine closings, a volume discount from his standard $400 fee. There is no

evidence or claim he otherwise personally benefited financially from these transactions.

On September 13, 2011, the jury convicted Engelmann on all nine counts. The jury rejected Engelmann's defense that he acted in good faith and had no intent to defraud because the lenders' agent was aware of the true sale prices and the kickbacks. To convict on each count, the jury instructions required the jury to find Engelmann possessed an "intent to defraud"[1] defined as follows:

---

[1]As taken from the jury instructions in Engelmann's case, the elements of conspiracy to commit bank fraud or wire fraud are:

(1) . . . [t]wo or more persons reached an agreement or came to an understanding to commit bank fraud or wire fraud;

(2) The defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

(3) At the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

(4) While the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did one or more overt acts for the purpose of carrying out or carrying forward the agreement or understanding.

The jury was instructed the elements of bank fraud are:

(1) The defendant knowingly executed, attempted to execute, or participated in a scheme to defraud a financial institution to obtain monies, funds and assets owned by and under the custody and control of a financial institution by means of material false and fraudulent pretenses, representations, and promises[;]

(2) The defendant did so with intent to defraud; and

(3) The financial institution was insured by the United States Government.

The jury was instructed the elements of wire fraud are:

(1) The defendant voluntarily and intentionally devised or made up a scheme to defraud another out of money or property, or participated in a scheme to defraud with knowledge of its fraudulent nature, or devised or participated in a scheme to

> [T]o act knowingly and with the intent to deceive someone for the purpose of causing some financial loss or loss of property or property rights to another or bringing about some financial gain to oneself or another to the detriment of a third party.

On January 26, 2012, the federal court sentenced Engelmann to thirty-six months in prison and ordered him to pay $392,937.73 in restitution. Engelmann moved for a new trial, contending a witness violated the sequestration order during trial and a jury instruction on his good-faith defense was erroneous. The district court denied his motion. *Id.* at 993. Engelmann appealed.

On March 20, while Engelmann's appeal was pending, the Board filed a complaint, alleging Engelmann violated Iowa Rules of Professional Conduct 32:1.2(d), 32:1.16(a)(1), 32:4.1(a), 32:4.1(b), and 32:8.4(b). The Board also alleged that Engelmann's felony convictions met the requirements for revocation or suspension under Iowa Code section 602.10122(1). The Board gave notice pursuant to Iowa Court Rule 35.7(3)(*c*) of its intent to invoke issue preclusion on all matters resolved in Engelmann's criminal trial.

Engelmann requested that the Board hold the disciplinary proceedings in abeyance until the Eighth Circuit issued its decision on his appeal. Engelmann filed denials to the paragraphs in the Board's complaint that alleged he made false representations, intentionally concealed facts, knew of the fraudulent nature of the transactions, or committed any of the charged crimes. He also denied that issue

---

obtain money or property by means of material false representations or promises;

(2) The defendant did so with the intent to defraud; and

(3) The defendant used, or caused to be used, the interstate wire facilities in furtherance of, or in an attempt to carry out, some essential step of the scheme.

preclusion should apply in the grievance commission proceedings and denied that he committed the alleged rule violations. His motion to hold the proceedings in abeyance, however, stated that if he "is unsuccessful in his appeal to the 8th Circuit, he will acquiesce in the suspension of his license without the necessity of the discovery and hearing process."

The Board agreed to postpone Engelmann's hearing. Engelmann consented to the temporary suspension of his license. That suspension has remained in effect since June 20, 2012. The disciplinary hearing before the commission took place on December 4. Engelmann's counsel again asked the commission to delay issuing its report until the Eighth Circuit ruled on Engelmann's appeal. His counsel stated on the record, "[I]f the conviction stands, Mr. Engelmann will surrender his license." Engelmann did not testify at the hearing, but his testimony from the criminal trial was introduced as an exhibit. The Board's attorney urged the commission to recommend revocation of his license.

On December 19, 2012, the Eighth Circuit remanded Engelmann's case for an evidentiary hearing concerning the alleged sequestration order violation. *United States v. Engelmann*, 701 F.3d 874, 875 (8th Cir. 2012). Engelmann again asked the commission to hold the proceedings in abeyance, and the commission granted this motion. After an evidentiary hearing, the district court denied his motion for new trial. This ruling was upheld on appeal. *United States v. Engelmann*, 720 F.3d 1005, 1008 (8th Cir. 2013).

On June 27, 2013, the commission filed its report, finding Engelmann violated all five rules as charged. The commission recommended an additional six-month disciplinary suspension in light of Engelmann's three-year prison sentence. Engelmann filed no subsequent response regarding the appropriate sanction.

### III. Review of Ethical Violations.

The underlying misconduct is similar to but more egregious than that in *Iowa Supreme Court Attorney Disciplinary Board v. Bieber*, 824 N.W.2d 514 (Iowa 2012). Engelmann and Bieber each represented sellers in real estate closings that led to criminal charges. *Engelmann*, 827 F. Supp. 2d at 987; *Bieber*, 824 N.W.2d at 516–17. Their respective clients each sold property to the same buyers, Robert Herdrich and Darryl Hanneken. *Engelmann*, 827 F. Supp. 2d at 987; *Bieber*, 824 N.W.2d at 516. Engelmann and Bieber played the same role in the real estate transactions. *Engelmann*, 827 F. Supp. 2d at 987; *Bieber*, 824 N.W.2d at 517. Bieber and Engelmann each prepared HUD-1 forms and other documents that reflected a higher selling price than the price actually agreed on by the parties and concealed the existence of cash kickbacks to the buyers. *Id.* Bieber pled guilty to misprision of a felony for a single transaction and was sentenced to three years of probation and ordered to pay $37,969.99 in restitution, which he paid in full. *Bieber*, 824 N.W.2d at 516. We found that Bieber had violated Iowa Rules of Professional Conduct 32:1.2(d), 32:1.16(a)(1), 32:4.1(a), 32:4.1(b), and 32:8.4(b)—the same rules the Board alleges Engelmann violated. *Id.* at 518–21. We address each rule in turn.

**A. Rule 32:4.1.** The commission found Engelmann violated rule 32:4.1(a) and (b). We agree. Rule 32:4.1(a) states, "In the course of representing a client, a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person." Iowa R. Prof'l Conduct 32:4.1(a). Rule 32:4.1(b) provides, "In the course of representing a client, a lawyer shall not knowingly . . . fail to disclose a material fact to a third person when disclosure is necessary to avoid

assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by rule 32:1.6." *Id.* r. 32:4.1(b).

Engelmann argued at trial that he did not make a false statement of material fact or fail to disclose a material fact. He maintained that he believed it was legitimate for Laures, Herdrich, and Hanneken to structure their contract with a cash refund to the buyers, although he admitted this was an unusual practice. He testified it was his belief that the closing company knew of the dual pricing structure and informed the lenders. He argued his misconduct was not criminal because the properties were independently appraised for the lenders and they relied on the appraised values, not the sales prices. Engelmann further argued he did not have the requisite intent for the conspiracy, bank fraud, or wire fraud convictions because he had a good-faith belief that the transactions were legal.

Engelmann's trial testimony that he informed the closing agent of the true sales prices was contradicted by his own assistant, who testified that he "instructed her not to disclose the inflated price or kickbacks" to the closing agent. *Engelmann,* 827 F. Supp. 2d at 987. FBI agents testified that Engelmann "admitted during an interview that the lenders did not know about the inflated price or the kickbacks." *Id.* And, regardless of whether Engelmann believed the lenders knew of the cash-back agreement, any good-faith belief does not excuse his false statements on the HUD-1 settlement statements and closing statements. *See Bieber*, 824 N.W.2d at 520. We further find that the false sales prices were material. Engelmann never testified that he believed the buyers were going to use the cash refund to improve the properties. In contrast, Bieber gave uncontroverted testimony that he and his client believed the additional loan proceeds obtained from the lender would be

used by the buyers to improve the property that secured the bank loan. *Id.* at 518, 525 n.8. Engelmann, an experienced real estate attorney who had represented many lenders, knew or should have known the lenders would rely in part on the stated selling prices on the HUD documents.

The federal jury verdict required a finding that Engelmann made material false and fraudulent representations with an intent to defraud. The commission correctly applied issue preclusion. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowers*, 823 N.W.2d 1, 7–8 (Iowa 2012) (discussing issue preclusion in disciplinary cases). The jury rejected Engelmann's defense. Based on the verdict affirmed on appeal, we do the same. We find Engelmann violated rules 32:4.1(a) and (b) by misrepresenting the true sales prices and by failing to disclose to the lenders the cash kickbacks and the inaccuracy of stated sales prices.

**B. Rules 32:1.2(d) and 32:1.16(a)(1).** Rule 32:1.2(d) prohibits a lawyer from assisting a client "in conduct that the lawyer knows is criminal or fraudulent." Iowa R. Prof'l Conduct 32:1.2(d). Rule 32:1.16(a)(1) provides guidance to a lawyer confronted with a situation in which the lawyer's assistance will facilitate illegality. It states that "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . the representation will result in violation of the Iowa Rules of Professional Conduct or other law." *Id.* r. 32:1.16(a)(1).

Engelmann testified at trial that Laures had signed a contract to sell his properties to Herdrich and Hanneken before retaining Engelmann on the matter. This does not change the fact that Engelmann assisted the parties in executing their fraudulent contract by preparing the inaccurate forms and representing Laures at the closings. Comment 10 to rule 32:1.2(d) addresses this situation:

> When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrongdoing might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or fraudulent. The lawyer must, therefore, withdraw from the representation of the client in the matter.

*Id.* r. 32:1.2(d) cmt. 10.

Engelmann knew the true sales prices of the properties were less than stated on the HUD-1 forms. He also knew the buyers were receiving loans that exceeded the actual sales prices. As an experienced real estate lawyer, Engelmann knew or should have known that such a contract was not aboveboard. He helped the parties complete their fraudulent transaction by preparing documents that misrepresented the facts of the transaction, deceiving the lenders. The jury's finding that Engelmann was guilty of bank fraud and wire fraud establishes that he "knowingly did one or more overt acts for the purpose of carrying out" the fraud. We apply issue preclusion to find that Engelmann knowingly assisted his client in defrauding the buyers' lender, in violation of rule 32:1.2(d). *See Bieber*, 824 N.W.2d at 517–18.

Engelmann should have declined to represent Laures in the transactions in the first instance. And, he should have withdrawn his representation before making misrepresentations. Engelmann had ample opportunity to withdraw. In fact, he had nine opportunities. But, instead of withdrawing, Engelmann continued to represent Laures in nine separate closings, misrepresenting the true price of the property in each transaction. We find Engelmann violated rule 32:1.16(a)(1).

**C. Rule 32:8.4(b).** Finally, the commission found Engelmann violated rule 32:8.4(b), which makes it "professional misconduct for a

lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Iowa R. Prof'l Conduct 32:8.4(b). A criminal act does not necessarily violate this rule. Rather, " '[t]here must be some rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weaver*, 812 N.W.2d 4, 11 (Iowa 2012) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 767 (Iowa 2010)). We weigh a number of factors to determine if a criminal act constitutes a violation of rule 32:8.4(b), including

> "the lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct."

*Id.* (quoting *Templeton*, 784 N.W.2d at 767).

As we recognized in *Bieber*, there is more than a "rational connection" when a lawyer's criminal behavior actually involves actions undertaken by the lawyer in the course of representing a client. 824 N.W.2d at 520. The jury's verdict establishes Engelmann possessed the intent to defraud. Engelmann's crime was not a victimless one: the extent of the harm was quite great, as reflected by the restitution order of $392,937.73. Finally, there is a pattern of criminal conduct in this case. There were nine separate closings and thus nine opportunities for Engelmann to disclose the true sales price. It is axiomatic that fraudulent behavior reflects adversely on a lawyer's honesty, trustworthiness, and fitness as a lawyer. We agree with the commission's finding that Engelmann violated rule 32:8.4(b).

**IV. Consideration of Appropriate Sanction.**

We now consider the appropriate sanction for Engelmann's rule violations. In crafting a sanction,

> we consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 441 (Iowa 2012) (citation and internal quotation marks omitted). For similar but less egregious misconduct, we suspended Bieber's license for six months. *Bieber*, 824 N.W.2d at 528. Engelmann, like Bieber, had no prior disciplinary or criminal record. But, we conclude Engelmann is significantly more culpable than Bieber.

First, their convictions are not the same: Bieber pled to one count based on a single transaction, *id.* at 516–17, whereas Engelmann was convicted of nine felonies based on nine transactions. Bieber pled guilty to misprision of a felony, a federal felony. *See* 18 U.S.C. §§ 4, 3559(a)(5) (2006); *Bieber*, 824 N.W.2d at 516. The elements of this crime are:

> "1) the principal committed and completed the alleged felony; 2) defendant had full knowledge of that fact; 3) defendant failed to notify the authorities; and 4) defendant took steps to conceal the crime."

*Bieber*, 824 N.W.2d at 516 n.2 (quoting *United States v. Cefalu*, 85 F.3d 964, 969 (2d Cir. 1996)). Looking to parallel state law crimes confirms that Engelmann's offenses are much more serious than Bieber's. Iowa does not have a precise counterpart to the federal crime of misprision of a felony, but the state law crimes of accessory after the fact, compounding a felony, and obstructing prosecution are similar. Iowa Code §§ 703.3, 720.1, 719.3. All three of these crimes are aggravated

misdemeanors under Iowa law. *See id.* By contrast, Engelmann's federal felonies line up with first-degree fraud, a class "C" felony under Iowa law.[2] *Id.* § 714.9. The consequences of Engelmann's misrepresentations were also substantially more severe than those in *Bieber* in terms of both pecuniary losses and sentencing. The federal district court ordered Bieber to pay \$37,969.99 in restitution to the lender and sentenced him to three years of probation, which was within the federal sentencing guidelines for his crime. 824 N.W.2d at 516. By the time of his disciplinary hearing, Bieber had fully paid his restitution. *Id.* at 518. In contrast, the court ordered Engelmann to pay \$392,937.73 in restitution and sentenced him to thirty-six months in prison. The record does not show any amount of restitution has been paid to date.

Moreover, Engelmann was a sophisticated real estate attorney, while Bieber did "some real estate work" in the course of his general civil practice. *Id.* " '[T]he law takes account of a lawyer's legal training and experience in assessing his or her state of mind.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barry*, 762 N.W.2d 129, 139 (Iowa 2009) (quoting 1 Geoffrey C. Hazard Jr. & W. William Hodes, *The Law of Lawyering* § 1.23, at 1–46 (3d ed. 2005-2 Supp.)). We expect an attorney who specializes in a particular field to be more aware and responsible. *See*

---

[2]The Iowa Code structure penalizing fraud increases the severity of the punishment as the value of the property involved increases. *See* Iowa Code §§ 714.9–.13 (2013). The highest degree of fraud is reserved for crimes involving property valued at more than \$10,000. *Id.* § 714.9. Iowa Code section 524.1607 criminalizes

> knowingly mak[ing] or caus[ing] to be made, directly or indirectly, any false statement in writing . . . with the intent that such statement shall be relied upon by a financial institution, a mortgage banker, a mortgage broker, or any other entity licensed by the banking division for the purpose of procuring the delivery of property, the payment of cash or the receipt of credit in any form, for the benefit of such person or of any other person in which such person is interested or for whom such person is acting.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weaver*, 750 N.W.2d 71, 92 (Iowa 2008) (finding "considerable professional experience" to be an aggravating factor).

But, most important is the difference in their states of mind. In *Bieber,* we noted "there is no evidence that Bieber knew the buyers were walking away with someone else's money." 824 N.W.2d at 523. Rather, "Bieber understood the excess funds provided by the lender would be spent on repairs to improve the property in which the lender had a security interest." *Id.* at 525 n.8. Specifically,

> Bieber asserted that both he and his client Woods believed the $55,000 rebate would actually go toward needed repairs and improvements to the property. By their account, which no one disputed, Bieber and Woods were unaware the buyers intended simply to pocket the difference between the $108,500 they had borrowed and the $100,000 net they had transferred to Woods.

*Id.* at 518. We stated, "Bieber did not convert funds himself or *knowingly* assist a client in doing so. . . . While [his] conduct is reprehensible, we do not think it is the same as outright theft of another person's money." *Id.* at 523 (emphasis added). Engelmann offered no comparable testimony in his own defense.

The same day we decided *Bieber,* we filed our decision in *Iowa Supreme Court Attorney Disciplinary Board v. Wheeler,* another case in which the attorney obtained a real estate mortgage through fraud. 824 N.W.2d 505, 508 (Iowa 2012). Specifically, attorney Ronald Wheeler agreed to serve as a straw man to obtain a loan to purchase a residence for his client. *Id.* Wheeler falsely stated on the loan application that he was the purchaser who would reside in the home. *Id.* Wheeler substantially overstated his assets and income and failed to disclose he financed the down payment. *Id.* His client moved into the home but

later failed to make payments, and after the real estate market crashed, Wheeler ultimately defaulted on the loan. *Id.* at 509. He filed for bankruptcy and pled guilty to making a false statement to a financial institution. *Id.* He was sentenced to probation and ordered to pay restitution. *Id.* Wheeler's state of mind was central to our decision to impose a six-month suspension rather than revoke his license:

> Wheeler intended to misrepresent the bank by filing false financial documents. Yet, his intent was to obtain a loan from the bank, not for the bank to suffer a loss. The misrepresentation was for the purpose of obtaining the loan, which Wheeler was contractually obligated to repay. He believed his client would eventually refinance the house and pay off the loan to the bank. He also believed the bank was protected from loss by the mortgage on the home.

*Id.* at 512. Wheeler, like Bieber, offered evidence in mitigation, including his cooperation with the board's investigation, his reputation in the legal community, voluntary community service, remorse over the conduct at issue, and acknowledgment of wrongdoing. *Id.* at 513; *see Bieber*, 824 N.W.2d at 527–28 (discussing his mitigating factors). We imposed the same six-month suspension as in *Bieber*, stating:

> Wheeler's act of knowingly making a false statement to a financial institution is inexcusable and cannot be undone. But, we do not believe Wheeler intended to misappropriate funds or aid Blessman in misappropriating funds. In this respect, this case involves similar underlying conduct to the *Bieber* case and many of the same mitigating factors. Upon our review, we agree with the commission's recommended sanction of a six-month suspension here. That is the same sanction we impose in *Bieber*.

*Wheeler*, 824 N.W.2d at 513.

By contrast, each of Engelmann's nine convictions required the jury to find he acted

> knowingly and with the intent to deceive someone for the purpose of causing some financial loss or loss of property or

> property rights to another or bringing about some financial
> gain to oneself or another to the detriment of a third party.

In light of this definition of "intent to defraud," the jury necessarily concluded beyond a reasonable doubt that Engelmann intended to cause the lenders financial harm. The jury that heard all the evidence is better positioned than our court to assess Engelmann's intent, when the only evidence he presented to the Board on that issue was a transcript of his own federal trial testimony. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 659 (Iowa 2013) (discussing our deference to credibility findings of fact finders who heard live testimony).

We have revoked the licenses of other Iowa lawyers who assisted clients in defrauding financial institutions out of money. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelsen*, 807 N.W.2d 259, 261 (Iowa 2011) (revoking license of attorney who aided and abetted his client in defrauding a bank); *Comm. on Prof'l Ethics & Conduct v. Austin*, 427 N.W.2d 465, 466 (Iowa 1988) (revoking license of attorney convicted of conspiracy to misapply bank funds). Engelmann collected only his $350 fee for each closing. He did not personally convert any funds or otherwise benefit financially from the fraud. But, his misconduct resulted in large financial losses by the lenders. Similarly, in *Nelsen*, we revoked the license of the lawyer who improperly diverted at least $141,335 to his client's secret account to avoid a court-appointed receivership, even though the lawyer personally did not profit from the conversion. 807 N.W.2d at 266–67. We have also revoked the licenses of attorneys convicted of felony financial fraud crimes. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Vinyard*, 656 N.W.2d 127, 128–31 (Iowa 2003) (revoking license of attorney convicted of mail fraud and money laundering; collecting revocation cases).

Other states have revoked the licenses of attorneys convicted of wire fraud or bank fraud against financial institutions under similar circumstances. *See, e.g.*, *People v. Sichta*, 948 P.2d 1018, 1019–20 (Colo. 1997) (disbarring attorney convicted of wire fraud); *In re Brewster*, 587 A.2d 1067, 1071 (Del. 1991) (disbarring attorney convicted of bank fraud); *Watkins v. Miss. Bar*, 589 So. 2d 660, 661, 666 (Miss. 1991) (finding automatic disbarment appropriate when lawyer was convicted of "multiple felony counts of financial institution fraud and false statements to influence actions of a federally insured financial institution"); *cf. In re Vaughn*, 585 S.E.2d 881 (Ga. 2003) (accepting attorney's voluntary surrender of license when attorney made false statements on HUD documents). The Louisiana Supreme Court permanently disbarred an attorney who was convicted of making false statements on an application for HUD mortgage financing, sentenced to eighteen months in prison, and ordered to pay $686,565.55 in restitution. *In re O'Keefe*, 46 So. 3d 1240, 1241, 1244 (La. 2010). The Massachusetts Supreme Court disbarred an attorney who was convicted of four counts of making false statements to a lender, five counts of mail fraud, and two counts of wire fraud. *In re Kennedy*, 697 N.E.2d 538, 539 (Mass. 1998). The attorney in that case made false statements on HUD documents for clients and fabricated income tax returns overstating his income in order to secure an inflated mortgage for himself. *Id.* at 539–40. The court stated that "[a]lthough Kennedy apparently received only $110 in legal fees for his services to clients in the transactions involved here, he benefited by retaining his clients." *Id.* at 541.

Engelmann acknowledged the seriousness of his misconduct by stating through counsel at the grievance commission hearing that he would surrender his license if his convictions were affirmed. His

convictions indeed were affirmed. He subsequently has made no further argument or submission as to the appropriate sanction. The Board recommended revocation. The commission's recommended six-month suspension took into account Engelmann's three-year prison sentence and accompanying temporary suspension. We give careful consideration to the parties' positions and commission's recommendation in making our own determination as to the sanction to impose. We conclude his license to practice law should be revoked.

## V. Disposition.

For the reasons stated in this opinion, the license of the respondent, Marc R. Engelmann, is revoked. We assess costs to the respondent as provided in Iowa Court Rule 35.27(1).

**LICENSE REVOKED.**