# IN THE SUPREME COURT OF IOWA

No. 16–0731

Filed September 16, 2016

Amended November 29, 2016

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**KATHRYN S. BARNHILL,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

The grievance commission reports an attorney violated several rules of professional conduct and recommends a suspension. **LICENSE SUSPENDED.**

Tara M. van Brederode, Des Moines, and Patrick W. O'Bryan of O'Bryan Law Firm, Des Moines, for complainant.

Kathryn S. Barnhill, West Des Moines, pro se.

**HECHT, Justice.**

The Iowa Supreme Court Disciplinary Board (the Board) charged attorney Kathryn Barnhill with violating multiple rules of professional conduct following two matters in which trial court judges imposed sanctions against Barnhill for her actions in those cases. The Iowa Supreme Court Grievance Commission (the commission) concluded Barnhill committed ethical violations and recommended suspension of Barnhill's license for six months. We now review the commission's recommendation. *See* Iowa Ct. R. 36.21.

## I. Background Facts and Proceedings.

"We admitted Barnhill to practice law in Iowa in 1989." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barnhill (Barnhill II)*, 847 N.W.2d 466, 471 (Iowa 2014). This disciplinary proceeding arises out of a fee dispute Barnhill had with a former client and out of her representation of a client in a property damage claim litigated in federal court.

**A. Fee Dispute.** Don Jayne hired Barnhill to represent him in a dispute with a contractor that filed a mechanic's lien on Jayne's property. The amount in controversy was under $20,000. Jayne signed a fee agreement with Barnhill in which he agreed to pay $200 per hour for Barnhill's services.

By the time the matter ended, Barnhill had billed Jayne over $60,000 for her work. Jayne paid the bill but believed it was unreasonable given the breadth of his legal problem. He retained new counsel and filed a complaint with the Polk County Bar Association Attorney Fee Arbitration Committee. In April 2014, the committee determined the fee Barnhill charged was "unreasonable given the amount of work performed . . . in relation to the scope of the problem." It ordered Barnhill to refund Jayne twenty-five percent of the fees collected. The

committee did not place any conditions on Jayne's entitlement to the refund.

Barnhill tendered Jayne a check for $1000 (check #1). However, she did not immediately pay the remainder (over $14,000) of the fee arbitration award. On May 30, 2014, we suspended her license for sixty days for unrelated ethical misconduct, with automatic reinstatement after the sixty days passed. *Id.* at 488. Obeying this court's order and the Iowa Court Rules, Barnhill notified Jayne's counsel, Kenneth Munro, that her license had been suspended. *See id.*

In August, after Barnhill's suspension ended, Munro wrote to Barnhill requesting that she pay the remainder of Jayne's refund. Barnhill did not respond. A month later, Munro sent another letter requesting payment. Barnhill responded by email in mid-September, explaining that she had not fully repaid Jayne because she was concerned doing so might constitute practicing law while her license was suspended. Because her license was now reinstated, she promised to "finalize th[e] payment" when she returned from an international trip.

In early October, Jayne informed Barnhill he had ended his attorney–client relationship with Munro and requested that Barnhill direct all further communications regarding the fee matter to him. On October 10, Barnhill sent a responsive letter to Jayne, signaling her intent to pay Jayne "by the end of this month if not sooner."

Barnhill missed her intended payment deadline and did not repay Jayne by the end of October. Jayne subsequently filed a complaint with the Board and retained attorney Kevin Abbott to collect the amount owed. Abbott sent Barnhill a letter dated November 24, 2014, in which he requested payment from Barnhill within ten days. Two weeks later, Barnhill responded by email that Abbott "should have [a] check for full

payment." Barnhill further requested that upon receiving the check (check #2), Jayne execute "a full release and satisfaction," including a "release" of Jayne's complaint to the Board.[1] Barnhill indicated she was "prepared to take all actions available," including "claims against Don Jayne resulting from his continuing conduct," unless she received "a global release within 48 hours." She also sent a fax to Abbott's office warning Abbott that she did not consent to him disbursing any proceeds of check #2 to Jayne until she received an acceptable release.

Despite Barnhill's statement to Abbott that she sent check #2 paying in full the balance of the fee arbitration award and her assertion that the funds were "presently being held" in Abbott's client trust account, Abbott never received the check. Accordingly, in January 2015, he filed a petition on Jayne's behalf in district court to enforce the fee arbitration committee's ruling. Barnhill answered the petition, asserting "[n]o amount remains unpaid." Barnhill also brought counterclaims against Jayne and cross-claims against Abbott (individually) and Abbott's law firm. The counterclaims and cross-claims contended Jayne, Abbott, and Abbott's firm were committing abuse of process and had conspired to do so. In answering the counterclaims and cross-claims, Abbott wrote Barnhill "has not made payment . . . and she is making a false statement to the Court by claiming she has made said payment."

In April, Barnhill sent Abbott a letter enclosing a photocopy of yet another instrument (check #3) payable to Abbott's trust account for the balance of the fee arbitration award. In this letter, Barnhill promised she would deliver check #3 once she received a release. Notably, check #3

---

[1]Barnhill's demand for a release of the complaint lodged with the Board was curious because Jayne lacked authority to halt the Board's investigation.

was dated March 16, 2015—*after* Barnhill's assertion of claims against Jayne, Abbott, and Abbott's firm. Abbott did not forward the requested release, and he never received check #3.

Jayne requested summary judgment in the district court litigation for the balance of the fee arbitration award, including "attorney fees for defending [Barnhill]'s bad faith [counter and cross] claims." Around the same time, Barnhill sent Abbott a letter enclosing another instrument (check #4) payable to Jayne in the amount of the balance owed on the fee arbitration award. The letter and check were dated May 4, 2015, but did not arrive at Abbott's office until May 20—after Abbott had already filed the motion for summary judgment. At the commission hearing, Abbott opined that Barnhill backdated the letter and check because she received notice of his motion for summary judgment "and then sent the check that da[y] or the day after," but wanted it to appear as though the check preceded the filing of the motion for summary judgment.

The memo line on check #4 stated "payment in full for all claims." Abbott received the check but did not tender it to Jayne because, he explained, accepting "payment in full" might compromise any chance of recovering court costs and attorney fees incurred in defending Barnhill's counterclaims and cross-claims. He asked Barnhill to send another check for court costs and attorney fees. Barnhill refused, stating the "costs were incurred . . . needlessly rather than cash[ing] the checks I have been sending." Abbott responded that "checks," plural, was a misstatement:

> I received one check from you. It was after I filed this lawsuit and after you filed your baseless claims against Mr. Jayne, myself and my firm. Obviously, if you had sent a check prior to me filing this lawsuit, I would have cashed it and not filed the lawsuit. Unfortunately, that did not happen.

The district court denied the summary judgment motion without a hearing.

A bench trial was held on Jayne's collection action against Barnhill. After hearing testimony and reviewing exhibits, the court ruled in Jayne's favor, finding Barnhill's testimony that she delivered a check in December 2014 "not credible in the least" and "completely without merit." The court entered judgment against Barnhill for the outstanding amount of the fee arbitration award owed to Jayne, plus court costs. Barnhill's counterclaims and cross-claims were dismissed because the court found "absolutely no basis" for them.

The court then addressed sanctions, including Abbott's request for attorney fees. It awarded over $2800 in attorney fees and imposed an additional sanction of $5000 against Barnhill for forcing Jayne to file a lawsuit—when there was no dispute she owed him over $14,000—and filing frivolous counterclaims in response to that lawsuit.

**B. BFC Gas Matter.** Barnhill represented BFC Gas Company in an action against Gypsum Supply Co. (GSC) for property damage. The lawsuit alleged GSC's "negligence caused parts of [GSC]'s facility to damage [BFC's] facility during a . . . storm." *BFC Gas Co. v. Gypsum Supply Co. (BFC I)*, No. 13-CV-81-LRR, 2014 WL 5286868, at *1 (N.D. Iowa Oct. 15, 2014).[2]

Discovery opened in August 2013. In the course of discovery, BFC did not designate expert opinions until months after the deadline. It also failed to produce some documents required as part of its initial disclosures and other documents properly requested by GSC, despite

---

[2]The lawsuit began in state court, but GSC "removed the action to [federal] court on the basis of diversity jurisdiction." *BFC I*, 2014 WL 5286868, at *1; *see* 28 U.S.C. § 1332(a) (2012).

GSC filing two motions to compel and the court granting both of them. *BFC Gas Co. v. Gypsum Supply Co. (BFC II)*, No. C13-0081, 2015 WL 64985, at *1 (N.D. Iowa Jan. 5, 2015). GSC ultimately prevailed on summary judgment. *See BFC I*, 2014 WL 5286868, at *11, *aff'd*, 630 F. App'x 645, 645 (8th Cir. 2016) (per curiam).

In spring 2014, GSC moved for sanctions against BFC and Barnhill. *See BFC II*, 2015 WL 64985, at *4. At a sanctions hearing, over which a federal magistrate presided, Barnhill made several statements the court ultimately determined were false and upon which the court relied in imposing sanctions against Barnhill and BFC. *Id.* at *15.

First, Barnhill claimed BFC could not produce some documents because the United States Attorney's Office (USAO) seized them and they were therefore inaccessible to BFC. *Id.* at *5. However, "[t]he truth is the documents were not seized until . . . more than two months *after*" BFC filed the lawsuit, so BFC had opportunity in making its initial disclosures to produce them. *Id.* at *6. Furthermore, the discovery responses BFC actually provided made "no reference . . . to the seizure of documents" and no claim "that . . . compliance with discovery demands was hampered" by it. *Id.* Barnhill also asserted some of the difficulty in producing documents occurred because BFC's corporate officers were recalcitrant about doing so despite Barnhill's repeated requests.

Second, Barnhill asserted she contacted the USAO "as soon as [she] realized [opposing counsel] was looking for" the documents—but opposing counsel first sought the documents in September 2013 and Barnhill did not contact the USAO until January 2014. *Id.* Additionally, Barnhill represented to the court "that she had 'just received' the requested documents," but she had actually received them three months earlier. *Id.*

Third, Barnhill represented to the court that BFC had not submitted a property damage claim to its own insurer because its deductible exceeded the amount of the damage. *Id.* at *8. However, "BFC had no insurance at the time of the loss," and the court found it "inconceivable . . . that Barnhill did not know the true facts regarding insurance when she" made the representation. *Id.*

The court ordered BFC and Barnhill to pay GSC's attorney fees (totaling over $30,000) incurred in litigating the discovery dispute and filing the motion for sanctions. *Id.* at *11–12, *15. It assessed over $18,000 of that amount solely against Barnhill. *Id.* at *12, *15. The court further assessed a $20,000 sanction against BFC and Barnhill jointly because it concluded the entire suit was frivolous. *Id.* at *15. In particular, the court relied upon several allegations from BFC's petition that were "simply not true" and that "[e]ven the most basic investigation would have revealed" were not true. *Id.* at *12–13. Specifically, the court referred to BFC's allegations that the storm caused no wind damage to BFC's own building and that no other buildings or structures in the immediate vicinity suffered damage. *Id.* In reality, "damage from the storm was widespread, including damage to other buildings in the immediate area." *Id.* at *13.

**C. Disciplinary Proceedings.** After Jayne's November 2014 complaint to the Board, the Board opened an investigation and sought a response from Barnhill. When Barnhill responded to the Board, she stated she made a partial payment to Munro and sent the remaining balance to Abbott. The Board then asked Barnhill to provide proof of the payments made to Jayne and either or both of his attorneys. In February 2015, when the Jayne litigation and disciplinary investigation

were both still ongoing, Jayne and Abbott both signed a letter to the Board indicating neither of them had yet received payment from Barnhill.

In April 2015, Barnhill sent a letter to the Board suggesting the disciplinary matter would be "susceptible of a summary judgment" in her favor. Barnhill stated she tried to pay Jayne twice, but he and Abbott had refused to accept her payment. Barnhill was unable to find a copy of the December check (check #2) she purportedly sent to Abbott, explaining she lacked documentation because she prepared it herself instead of delegating the task to her office bookkeeper who was meticulous about making copies.

The Board filed a formal complaint with the commission in October 2015. It alleged Barnhill violated the Iowa Rules of Professional Conduct during the Jayne matter by asserting frivolous claims, Iowa R. Prof'l Conduct 32:3.1; making a false statement of fact to a tribunal, *id.* r. 32:3.3(a)(1); making a false statement of fact to a third person, *id.* r. 32:4.1(a); making a false statement of material fact in a disciplinary matter, *id.* r. 32:8.1(a); engaging in conduct involving dishonesty, deceit, or misrepresentation, *id.* r. 32:8.4(c); and engaging in conduct prejudicial to the administration of justice, *id.* r. 32:8.4(d).

The Board further alleged Barnhill violated several rules of professional conduct in the BFC matter by asserting frivolous claims, *id.* r. 32:3.1; making a false statement of fact to a tribunal, *id.* r. 32:3.3(a)(1); knowingly disobeying an obligation under the rules of a tribunal, *id.* r. 32:3.4(c); failing to comply with an opponent's proper discovery request, *id.* r. 32:3.4(d); making a false statement of fact to a third person, *id.* r. 32:4.1(a); engaging in conduct involving dishonesty, deceit, or misrepresentation, *id.* r. 32:8.4(c); and engaging in conduct prejudicial to the administration of justice, *id.* r. 32:8.4(d). The Board requested the

commission suspend Barnhill and condition her reinstatement upon Barnhill providing certified proof that she has paid all court ordered sanctions.

The commission set a hearing for February 2016. Before the hearing, Barnhill filed a "motion for summary judgment" seeking dismissal of the disciplinary complaint. In her motion, she asserted she sent a check to Abbott to pay the balance of the fee award in December 2014 and contended her bank statements circumstantially proved her assertion because they demonstrated her trust account contained an amount sufficient to satisfy the obligation from December 2014 onward. The Board resisted the motion. The commission panel president questioned whether the court rules permit summary judgment practice in disciplinary matters. *See* Iowa Ct. R. 36.14 (permitting "preliminary" motions and applications in disciplinary matters). However, even assuming the court rules permit dispositive motions in disciplinary proceedings, the panel president nonetheless denied Barnhill's motion.

At the hearing before the commission, the parties first addressed the BFC matter. Barnhill called two BFC witnesses who testified about the basis for the property damage claim and attempted to corroborate Barnhill's explanation about the difficulty obtaining records and documents due to the USAO investigation and seizure of documents. The Board called as a witness Barnhill's opposing counsel from the case. He testified about the course of the federal court litigation—including the dispositive order finding BFC's expert designations untimely and granting summary judgment in favor of the defendant. He also testified about his interactions with Barnhill during the discovery process and disputes and about the sanctions order entered against Barnhill and her client.

Next, the Board called Abbott to testify about the Jayne matter. Abbott explained his practice is exclusively commercial collections. He also explained he notified the accounting staff at his firm "to be on the lookout" for the check Barnhill claimed she sent in December 2014 (check #2), but no check ever arrived. He described his office's specialization in collections, related its established procedure for receiving and documenting checks, and testified that procedure did not reveal any checks arriving from Barnhill before the motion for summary judgment was filed in the collection action.

Barnhill's accountant also testified at the hearing. She misidentified the number of the purported December 2014 check (check #2) several times, then stated she "would have to look at the records again"—but nonetheless had a "clear recollection" that Barnhill's firm sent a check in December, even though she personally was "not in the office that week." On cross-examination, the Board's counsel pointed out that the accountant knew of the scheduled commission hearing but still did not have and could not produce at the hearing a copy of the check.

Finally, Barnhill gave a professional statement to the commission:

> I have made no false statements, I have committed no ethics violations, I paid the amount I was legally obligated to pay by the fee arbitration award, and had the funds in the bank account to cover the checks. I had nothing to gain by not paying that sum. I believe this grievance is frivolous and should be dismissed.

Perceiving a factual discrepancy, one panel member cross-examined Barnhill about her statements and the evidence she had presented:

> Q. Ms. Barnhill, you indicated that Mr. Abbott never asked you for a replacement check or indicated that he had never received this other check; is that correct? A. Yes.

> Q. And yet, when you got [serv]ed with a lawsuit in January, did you not assume that that meant he hadn't

gotten the check?  A.  No, I didn't, because as you see, he's still holding that one.

Q.  And how far is your office, roughly, from where Mr. Abbott's office is?  Couple miles?  A.  Probably.

Q.  And so in February . . . 2015, you filed an answer and a counterclaim with a cross-claim?  A.  Yes.

Q.  Yet within two miles you could have hand delivered a check to Mr. Abbot's office to cure this problem?  A.  I don't believe he would have accepted it.  I've thought this through at length.  That is why I made out checks to Don Jayne.  I thought he would be compelled to give the checks that were made payable to Don Jayne to Don Jayne.

Q.  But you didn't do such a check to Mr. Jayne until May; is that right?  A.  That's correct.

Q.  On the contrary to what you just said, in March of 2015 you made a check [(check #3)] out again to the Abbott Law Firm Trust Account.  A.  Yes.

Q.  So that's just contrary to what you just offered to this commission.  A.  In what way?

[PANEL MEMBER]: I have no further questions.

In her closing statement, Barnhill reiterated that she had no reason to avoid paying Jayne and especially no reason to lie about it.  She also expressed some exasperation: "I don't know why I seem to strike people as . . . such a liar, but there is no reason."

The commission concluded the Board proved a violation of each of the rules alleged, with one exception: the commission did not find a convincing preponderance of evidence indicating Barnhill violated rule 32:4.1(a) by making a false statement of material fact to a third person in either the Jayne matter or the BFC matter.  The commission considered in mitigation Barnhill's pro bono work and sponsorship of incarcerated women.  However, it ultimately concluded the aggravating factors in this case far outweighed mitigating considerations.  Those aggravating factors included Barnhill's history of disciplinary matters and sanctions for

substantially similar conduct, financial harm caused to Jayne, and "Barnhill's . . . refusal to acknowledge even the possibility that her conduct violated the rules of professional responsibility." *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowers*, 823 N.W.2d 1, 17 (Iowa 2012) (considering as an aggravating factor the attorney's defiance, disdain, and derision exhibited during the commission hearing). The commission recommended an indefinite suspension with no possibility of reinstatement for six months and proposed a condition on reinstatement requiring Barnhill "to provide proof that all outstanding debts levied against her arising out of the Jayne and [BFC matters] have been fully and completely satisfied."

Barnhill filed a notice of appeal from the commission's report. However, she later decided not to pursue the appeal and filed a statement signaling her desire "to retire from the practice of law and voluntarily turn in her law license." "An attorney . . . may acquiesce to suspension or disbarment, but only by delivering to the grievance commission an affidavit stating that the attorney consents to suspension of not more than a specific duration or to disbarment" and that fulfills several other requirements. Iowa Ct. R. 34.16(1). Barnhill has not delivered or filed such an affidavit, and the required procedure under rule 34.16 has not occurred. *See id.* r. 34.16(2)–(3). Accordingly, we proceed to review the commission's recommendation. *See id.* r. 36.21(1) ("If no appeal is taken . . . the supreme court will set a date for submission of the grievance commission report.").

## II. Scope of Review.

We review attorney disciplinary matters de novo. *Id.*; *Barnhill II*, 847 N.W.2d at 470. "The Board must prove the attorney's ethical misconduct by a convincing preponderance of the evidence"—a standard

"that is higher than the burden in civil cases but lower than the burden in criminal matters." *Barnhill II,* 847 N.W.2d at 470.

### III. Rule Violations.

Although the courts in the Jayne and BFC matters concluded Barnhill engaged in sanctionable conduct, those rulings do not have preclusive effect in this disciplinary proceeding on the question of whether Barnhill violated the rules of professional conduct. "The difference in burden of proof between an ordinary civil action and a disciplinary action generally means civil actions do not have preclusive effect in disciplinary hearings." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cepican,* 861 N.W.2d 841, 845 (Iowa 2015); *accord* Iowa Ct. R. 36.17(4); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Murphy,* 669 N.W.2d 254, 257 (Iowa 2003).

Although the rulings do not have preclusive effect, they remain valid and enforceable. We lack authority to review either sanctions order on the merits because Barnhill voluntarily dismissed her appeal of the Jayne matter and any appeal from the BFC matter would be decided by the United States Court of Appeals for the Eighth Circuit, not this court. *Cf. Barnhill v. Iowa Dist. Ct. (Barnhill I),* 765 N.W.2d 267, 280 (Iowa 2009) (reviewing a sanctions order on the merits when the appellant actually pursued the appeal). In this case, we simply review whether the evidence supporting the sanctions imposed in those matters also demonstrates an ethical violation by a convincing preponderance. Conduct occurring in federal courts located in Iowa is subject to the Iowa Rules of Professional Conduct even though attorneys must obtain separate admission to practice in federal court. N.D. & S.D. Iowa Civ. R. 83.1(g)(1); *see* Iowa R. Prof'l Conduct 32:8.5(b)(1) (providing "the rules of the jurisdiction in which the tribunal sits" shall govern the "exercise of the disciplinary

authority of Iowa"); *cf. In re Disciplinary Action Against Lyons*, 780 N.W.2d 629, 634 & n.2 (Minn. 2010) (per curium) (applying the Montana Rules of Professional Conduct in a Minnesota disciplinary proceeding against a lawyer whose conduct occurred in federal district court in Montana).

**A. Frivolous Claims.** "A lawyer shall not bring or defend a proceeding . . . unless there is a basis in law and fact for doing so that is not frivolous . . . ." Iowa R. Prof'l Conduct 32:3.1. When evaluating whether an attorney violated rule 32:3.1, we identify "the alleged offending conduct and [ask] whether there was legal authority to support the attorney engaging in this conduct." *Barnhill II*, 847 N.W.2d at 485.

The conduct at issue in the Jayne matter is Barnhill's assertion that Abbott, Abbott's firm, and Jayne committed abuse of process by not accepting multiple checks she purportedly sent and by filing a lawsuit against her instead. "To prove a claim of abuse of process, a plaintiff must show (1) use of the legal process, (2) in an improper or unauthorized manner, and (3) that damages were sustained as a result of the abuse." *Stew-Mc Dev., Inc. v. Fischer,* 770 N.W.2d 839, 849 (Iowa 2009). "The plaintiff must prove that the defendant used the legal process *primarily* for an impermissible or illegal motive." *Wilson v. Hayes*, 464 N.W.2d 250, 266 (Iowa 1990) (en banc).

Like the district court in the underlying Jayne litigation, we conclude Barnhill's counterclaims and cross-claims were meritless. To prove Abbott and Jayne were using the legal process in an improper or unauthorized manner and were doing so primarily with an illegal or impermissible motive, Barnhill would have had to prove she in fact sent check #2 in December 2014 and Abbott lied about never receiving it. Like the commission, we find Abbott's explanation much more credible.

In light of Barnhill's unfulfilled promises to pay Jayne in September and October and her inability to provide anything other than naked assertions and conclusory testimony from her accountant who was away from the office when Barnhill claims to have drawn the check, we conclude there was no plausible factual basis for the counterclaims and cross-claims. Although filing a claim "is not frivolous merely because the facts have not first been fully substantiated," it *is* frivolous "if the lawyer is unable . . . to make a good faith argument on the merits." Iowa R. Prof'l Conduct 32:3.1 cmt. 2. No good-faith basis existed here. We find Barnhill violated rule 32:3.1 in the Jayne matter.

The federal district court in the BFC matter also determined Barnhill filed a frivolous claim. However, the evidence in the federal district court file bearing upon the nature of the storm and the resulting damage is not in the disciplinary record in this case. We conclude there is not a convincing preponderance of evidence demonstrating the BFC claim was frivolous under rule 32:3.1.

**B. False Statements.** "A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal . . . ." *Id.* r. 32:3.3(a)(1). Similarly, "a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person." *Id.* r. 32:4.1(a). The word "knowingly" is important; "[w]e will not infer an attorney made a misrepresentation knowingly simply because the misrepresentation occurred." *Barnhill II*, 847 N.W.2d at 486. False statements also implicate two other ethical rules: prohibitions against "conduct involving dishonesty, fraud, deceit, or misrepresentation" and "conduct that is prejudicial to the administration of justice." Iowa R. Prof'l Conduct 32:8.4(c)–(d).

1. *False statements to a tribunal and in a disciplinary matter.* In *Barnhill II*, we concluded Barnhill did not violate rule 32:3.3(a)(1) when she "[a]t most . . . acknowledged her petition contained false information." *Barnhill II*, 847 N.W.2d at 486. Barnhill did much more than that here. "[F]alse statements to the court can be made both orally and in writing," and we find Barnhill did both. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 462 (Iowa 2014).

In the Jayne matter, Abbott contended in his answer to Barnhill's counterclaims and cross-claims that Barnhill was making a false statement to the court by claiming she had paid Jayne. We agree. Barnhill not only included false information in her pleadings; she premised an entire cause of action on the false assertion that payment of the balance of the fee arbitration award had been tendered, continued to assert the falsity throughout the bench trial, and even filed a motion for new trial reiterating it. We find she violated rule 32:3.3(a)(1). We also agree with the commission that Barnhill's continued assertion in this disciplinary proceeding that she sent a check when she actually did not constitutes a violation of rule 32:8.1(a), which prohibits lawyers from making false statements of material fact "in connection with a disciplinary matter." Iowa R. Prof'l Conduct 32:8.1(a).

We also conclude Barnhill violated rule 32:3.3(a)(1) in the BFC litigation. The record includes copies of emails demonstrating Barnhill's receipt of the documents earlier than she represented to the court and establishing her first contact with the USAO occurred long after she asserted it had taken place.

2. *False statements to a third person.* The commission concluded the Board did not prove Barnhill made false statements of material fact to a third person in violation of rule 32:4.1(a). The issue to be resolved in

determining whether Barnhill violated this rule is whether opposing counsel is a third person within the meaning of the rule. We have found an attorney violated rule 32:4.1(a) when he made false statements to real estate lenders issuing loans to the attorney's clients. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Engelmann*, 840 N.W.2d 156, 162 (Iowa 2013). We have not decided, however, whether "third person" includes opposing counsel.

The Iowa Rules of Professional Conduct include a rule addressing fairness to opposing parties and counsel. Iowa R. Prof'l Conduct 32:3.4. However, unlike the rule preceding it, which addresses candor toward the tribunal, rule 32:3.4 does not expressly address a duty of candor toward the opposing party and counsel. *Compare id., with id.* r. 32:3.3. Instead, rule 32:3.4 primarily addresses discovery conduct and an attorney's presentation of their client's evidence and testimony. *See id.* r. 32:3.4 cmt. 1 ("Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like."). Nonetheless, we conclude the absence of an express prohibition against false statements to opposing counsel in rule 32:3.4 does not exclude opposing counsel from the universe of third persons mentioned in rule 32:4.1.

Rule 32:4.1 appears in a section of the rules entitled "Transactions with Persons Other Than Clients." The comments to the rules explain that lawyers are "required to be truthful when dealing with others on a client's behalf." *Id.* r. 32:4.1 cmt. 1. These references to "others" are clearly broad and include anyone apart from the lawyer's client or a tribunal (which rule 32:3.3 addresses separately).

Furthermore, our research reveals some courts in other jurisdictions with materially similar or even identical ethical rules consider opposing counsel a third person within the meaning of the rule. *See, e.g., In re Corizzi,* 803 A.2d 438, 441 & n.5 (D.C. 2002); *La. State Bar Ass'n v. Harrington,* 585 So. 2d 514, 519 (La. 1990); *Att'y Grievance Comm'n v. Trye,* 118 A.3d 980, 990 (Md. 2015); *In re Walsh,* 872 N.W.2d 741, 749 (Minn. 2015) (per curiam); *In re Edison,* 724 N.W.2d 579, 584 (N.D. 2006) (per curiam); *Office of Disciplinary Counsel v. Battistelli,* 457 S.E.2d 652, 660 (W. Va. 1995). Today we join those jurisdictions and hold an attorney can violate rule 32:4.1(a) by making a false statement of material fact to opposing counsel.

Although the commission concluded Barnhill did not violate this rule, we disagree. Barnhill repeatedly stated falsely to Abbott that she had sent payment when she had not. The fact Abbott did not believe those statements is of no consequence to our determination. The rule prohibits attorneys from making knowingly false statements, with no exception providing an attorney does not commit an ethical violation if the third person knows or believes the statement is false. We conclude Barnhill violated rule 32:4.1(a) in the Jayne matter.

We decline to find Barnhill violated the same rule in the BFC matter, however. We have already concluded Barnhill violated rule 32:3.3(a)(1) by making false statements to the court at the sanctions hearing. We do not find a duplicative violation of rule 32:4.1(a) simply because opposing counsel was also present when the conduct occurred.

3. *Conduct involving dishonesty, deceit, or misrepresentation.* "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c). As we have explained,

> Rule 32:8.4 is a general rule prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation. The Iowa Rules of Professional Conduct contain other, more specific, provisions dealing with the same concept. . . . When we find conduct violates a specific provision involving dishonesty, fraud, deceit, or misrepresentation, we will not find the same conduct violates rule 32:8.4(c).

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 605 (Iowa 2011). Rules 32:3.3(a)(1) and 32:4.1(a) are more specific provisions dealing with the same conduct. Accordingly, because we have already found Barnhill violated these rules, we do not find a separate violation of rule 32:8.4(c). *See id.*

4. *Conduct prejudicial to the administration of justice.* As we have already noted, the Board alleged and the commission found Barnhill violated rule 32:8.4(d), which prohibits lawyers from engaging "in conduct that is prejudicial to the administration of justice." Iowa R. Prof'l Conduct 32:8.4(d). "[T]here is no typical form of conduct" that violates this rule. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Steffes*, 588 N.W.2d 121, 123 (Iowa 1999) (en banc). "Instead, the dispositive inquiry is whether 'the attorney's act[s] hampered the efficient and proper operation of the courts or of ancillary systems upon which the courts rely.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kingery*, 871 N.W.2d 109, 121 (Iowa 2015) (alteration in original) (quoting *Steffes*, 588 N.W.2d at 123); *accord Barnhill II*, 847 N.W.2d at 484.

An attorney violates rule 32:8.4(d) "when his [or her] misconduct results in additional court proceedings or causes court proceedings to be delayed or dismissed." *Barnhill II*, 847 N.W.2d at 484 (alteration in original) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 841 N.W.2d 114, 124 (Iowa 2013)). In *Barnhill II*, we concluded Barnhill violated rule 32:8.4(d) "by continuing to pursue an unwarranted claim." *Id.* She did the same thing in this case by pursuing frivolous claims in

the Jayne matter and by repeatedly asserting she had paid Jayne in full when she had not. Her conduct led to an entire lawsuit and bench trial that were ultimately unnecessary. Furthermore, her failure to comply with discovery obligations in the BFC matter led to additional court proceedings, including a sanctions hearing and hearings on GSC's motions to compel. Indeed, even after granting summary judgment to GSC, the federal district court had to leave the case open so that the sanctions issue could be resolved. We conclude Barnhill violated rule 32:8.4(d) in both matters.

**C. Conduct in Discovery.** The commission found Barnhill committed two additional violations in the BFC matter: knowing disobedience of a court order and failure to comply with an opponent's proper discovery request. Iowa R. Prof'l Conduct 32:3.4(c)–(d). A lawyer "must have actual knowledge of the court order to violate" rule 32:3.4(c). *Barnhill II*, 847 N.W.2d at 484. "If an attorney has knowledge of the court order, and yet fails to obey the court order, the attorney violates" rule 32:3.4(c). *Id.* The federal district court issued orders on January 22 and March 18, 2014, compelling BFC to provide discovery responses, but responses were not made. Responding to the motion for sanctions for her failure to comply with these orders compelling discovery, Barnhill asserted the USAO's seizure of documents obstructed her ability to comply. The federal court order imposing sanctions against Barnhill, however, noted that the requested documents had not yet been seized when they were requested and Barnhill and her client should have disclosed them as part of their initial disclosures under the applicable federal rules of procedure. The federal court's order imposing sanctions further concluded that some of the items (emails) requested from BFC in

discovery remained accessible to BFC notwithstanding the seizure and should have been produced in response to discovery requests.

At the hearing before the commission, Barnhill attributed her failure to comply with the discovery orders to the uncooperativeness of her client. We find this attribution unavailing, however. The record reveals the USAO provided Barnhill access to the seized documents on February 21, 2014—well before the second order compelling discovery on March 18. We conclude Barnhill violated rule 32:3.4(c).

Rule 32:3.4(c) and rule 32:3.4(d) are interrelated; courts often grant motions to compel and issue corresponding orders (giving rise to possible violations under rule 32:3.4(c)) after a party has already failed to comply with proper discovery requests—a violation of rule 32:3.4(d). *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hedgecoth*, 862 N.W.2d 354, 362–63 (Iowa 2015). We have concluded an attorney violated rule 32:3.4(d) when "the court granted several motions to compel and motions for sanctions filed by opposing counsel" because the attorney "repeatedly failed to provide timely discovery responses to opposing counsel's proper requests." *Id.* Barnhill's conduct in this case was similar to the conduct we concluded in *Hedgecoth* violated the rule. *See id.* We conclude Barnhill violated rule 32:3.4(d).

**IV. Sanction.**

Having concluded Barnhill committed ethical violations, we now turn to decide the appropriate sanction. Our guidelines for sanctions in attorney disciplinary matters are well established:

> In considering an appropriate sanction, this court considers all the facts and circumstances, including the nature of the violations, the attorney's fitness to practice law, deterrence, the protection of society, the need to uphold public confidence in the justice system, and the need to maintain the reputation of the bar. We also consider mitigating and

aggravating circumstances. The court gives respectful consideration to the findings and recommendations of the commission, but "may impose a greater or lesser sanction than that recommended by the commission."

*McGinness*, 844 N.W.2d at 463–64 (citations omitted) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wheeler*, 824 N.W.2d 505, 509–10 (Iowa 2012)). "The primary goal of attorney discipline is to protect the public, not to punish the attorney." *Barnhill II*, 847 N.W.2d at 487.

In *Barnhill II*, we concluded a sixty-day suspension was appropriate after Barnhill pressed frivolous claims, knowingly disobeyed court orders, and engaged in conduct prejudicial to the administration of justice (among other violations). *Id.* at 488. We weighed aggravating factors, including "Barnhill's extensive legal experience," the fact she caused client harm, the multitude of violations, and "two prior admonitions from the Board." *Id.* at 486. In mitigation, we considered Barnhill's pro bono work and volunteerism, her acknowledgement of the violations, and the sanctions already imposed on her in the underlying district court matters. *Id.* at 486–87; *see also Everly v. Knoxville Cmty. Sch. Dist.*, 774 N.W.2d 488, 495 (Iowa 2009) (affirming the district court's decision to sanction Barnhill but remanding for determination of an appropriate sanction); *Barnhill I*, 765 N.W.2d at 279–80 (affirming a monetary sanction the district court imposed upon Barnhill).

The conduct in this case was similar to the conduct for which we have previously suspended Barnhill. In fact, much of Barnhill's conduct in the Jayne matter began immediately after her previous suspension for similar misconduct ended. "Prior misconduct is more suggestive of increased sanctions when it involves the same type of conduct as the conduct currently subject to discipline." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Baldwin*, 857 N.W.2d 195, 214 (Iowa 2014). Barnhill's

disciplinary history is an aggravating factor. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Conroy*, 845 N.W.2d 59, 67 (Iowa 2014) (noting the fact an attorney received a suspension for identical misconduct just three years earlier was an aggravating factor and demonstrated the current misconduct was "an unfortunate but recurrent theme").

Additionally, "persistence . . . in perpetuating [a] falsehood is a remarkable aggravating factor." *McGinness*, 844 N.W.2d at 466. Barnhill asserted throughout the Jayne litigation that she sent check #2 to Abbott in December 2014 in payment of the balance owed on the fee arbitration award. However, the district court found that argument meritless because Barnhill provided no proof of the check or of any aspect of its delivery—including a return receipt or even the name of the courier who delivered it. Even so, Barnhill continued to assert before the commission that she sent Abbott a timely check. At the commission hearing, Barnhill called her accountant to testify about check #2. The accountant first testified she could not remember the check number but, after Barnhill stated she thought the accountant was "misremembering," changed her testimony to be that the check had no number because it was a counter check. Yet in the underlying Jayne litigation only a month earlier, Barnhill propounded in support of her defense the accountant's affidavit asserting check #2 bore a specific number. The accountant's testimony and Barnhill's repeated assertions about the check are not credible in light of the multiple contradictions and especially in light of the fact a financial record like a check should be easily retrievable. Barnhill's continued insistence that she sent a check despite a total lack of proof is an aggravating factor. *See id.*

Furthermore, Barnhill "has twenty years' experience as an attorney, which can be considered an aggravating factor." *Iowa Supreme*

*Ct. Att'y Disciplinary Bd. v. Kennedy*, 837 N.W.2d 659, 675 (Iowa 2013); *accord Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morris*, 847 N.W.2d 428, 436 (Iowa 2014). Just as Barnhill's experience was an aggravating factor two years ago, we consider it an aggravating factor again here. *See Barnhill II*, 847 N.W.2d at 486.

Some of the mitigating factors present in *Barnhill II*—specifically, Barnhill's volunteerism and pro bono work—are also mitigating factors in this case. *See id.* Additionally, as in *Barnhill II*, to some extent "courts have already punished Barnhill by levying sanctions . . . against her." *Id.* at 488. Barnhill did not acknowledge violations or accept responsibility in this case as she did in the previous disciplinary proceeding. *See id.* at 486. However, she indicates she intends to retire from practicing law. Voluntary cessation of practice or a self-imposed practice limitation does not excuse misconduct but can be a mitigating factor. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 860, 871 (Iowa 2010); *see also Kingery*, 871 N.W.2d at 124–25 ("[W]e can consider voluntary cessation when evaluating whether our sanction will serve its purposes of deterring future misconduct and protecting the public."). Nonetheless, even when an attorney "indicated he ha[d] no plans to resume the practice of law," we concluded a suspension was "consistent with promoting public confidence in the justice system and maintenance of the reputation of the bar as a whole." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ireland*, 748 N.W.2d 498, 503 (Iowa 2008). A suspension is appropriate here despite Barnhill's stated intent to retire.

"Sanctions for violations involving dishonesty have ranged from a brief suspension . . . to revocation." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kieffer-Garrison*, 847 N.W.2d 489, 496 (Iowa 2014); *accord Barnhill II*, 847 N.W.2d at 487. "We have in the past suspended lawyers

from the practice of law for filing frivolous matters, although these cases have been accompanied by other unethical conduct." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Daniels*, 838 N.W.2d 672, 679 (Iowa 2013). We have even revoked lawyers' licenses in some circumstances, usually when the lawyer commits a bevy of exceptionally serious ethical infractions alongside frivolous litigation. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rickabaugh*, 728 N.W.2d 375, 381–82 (Iowa 2007) (revoking a lawyer's license after he fabricated documents, forged signatures (including a judge's signature), accepted fees prematurely, practiced law while suspended, and generally "demonstrated a blatant disregard for his duty as an attorney to be honest and truthful"); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515, 520, 522–23 (Iowa 1996) (per curium) (revoking a lawyer's license after the lawyer pressed a frivolous claim resulting in sanctions imposed against him and separately and repeatedly made unfounded and unsupported allegations that several judges and lawyers were conspiring to violate his civil rights and tortiously injure him). Frivolous claims and false statements are particularly troublesome. As we have explained,

> Fundamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy. The court system and the public we serve are damaged when our officers play fast and loose with the truth.

*Comm. on Prof'l Ethics & Conduct v. Bauerle*, 460 N.W.2d 452, 453 (Iowa 1990); *accord Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bjorklund*, 725 N.W.2d 1, 12 (Iowa 2006) ("A lawyer who employs dishonesty as a routine component of his [or her] normal operating procedure clearly lacks the character required of members of the bar."); *Comm. on Prof'l Ethics & Conduct v. Postma*, 430 N.W.2d 387, 392 (Iowa 1988) ("Our profession

has no place for persons who demonstrate a penchant for distorting the truth.").

Although Barnhill's ethical shortcomings in this case are serious, they do not involve the panoply of violations and auxiliary misconduct that justified revocation in some cases. However, they are also not so isolated as to justify a mere reprimand. *See Daniels*, 838 N.W.2d at 679 (imposing a reprimand for one isolated instance of filing a frivolous claim). Instead, Barnhill committed violations in multiple matters on the heels of a suspension for committing very similar violations in other matters. That pattern of misconduct deserves a suspension. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gallner*, 621 N.W.2d 183, 187 (Iowa 2001) ("Normally, a pattern of misconduct gives rise to enhanced sanctions.").

We now turn to cases involving similar misconduct. In a recent case involving primarily and exclusively an attorney's dishonesty, we imposed a six-month suspension. *McGinness*, 844 N.W.2d at 467. The attorney violated rules 32:3.3(a)(1)(A), 32:8.4(c), and 32:8.4(d) by copying "old certificates of service in an attempt to deceive opposing counsel" and then "attempt[ing] to cover his tracks with more fabrication." *Id.* at 462–63. We concluded the violations' seriousness simply outweighed the mitigating circumstances—which included community service and an unblemished disciplinary history:

> Our citizens generally, and this court particularly, rely upon the honesty and integrity of lawyers to ensure the fair operation of our adversary system of justice. In the arena of civil discovery, the honesty of lawyers is an essential component. While McGinness's conduct may be an extraordinary one-time occurrence that is out of character for him, we must protect the integrity of the judicial system and the lawyers who work within it.

*Id.* at 467. We find *McGinness* to be a useful comparator.

We imposed a three-month suspension when, in one matter, an attorney made misleading statements to the court and persisted in a defense position "that was patently frivolous." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hohnbaum*, 554 N.W.2d 550, 552 (Iowa 1996). Similarly, in 2013, we imposed a thirty-day suspension on an attorney who made false statements to a tribunal and engaged in conduct prejudicial to the administration of justice by committing "acts of false notarization" in one matter. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Palmer*, 825 N.W.2d 322, 325–26 (Iowa 2013). We noted the violations were "less extensive than those at issue in [prior cases presenting similar facts] and deserve[d] a correspondingly less severe sanction." *Id.* at 326.

After considering these cases and the circumstances presented here, we conclude a six-month suspension is appropriate. Barnhill's misconduct is just as serious as the conduct we condemned in *McGinness*. And while we imposed a three-month suspension for a one-time occurrence in *Hohnbaum*, Barnhill has established a pattern of unethical conduct and a disciplinary history justifying a lengthier suspension in this case. If that pattern continues, the sanctions will escalate further in any future disciplinary proceedings—including possible revocation. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman*, 674 N.W.2d 129, 139 (Iowa 2004) (revoking the license of a lawyer who "repeatedly and convincingly demonstrated his inability and unwillingness to abide by our canons of ethics"); *see also Conroy*, 845 N.W.2d at 67 ("Conroy has now been suspended twice with escalating sanctions . . . . The two suspensions will be an aggravating factor should there be future proceedings involving Conroy . . . .").

**V. Conclusion.**

We suspend Barnhill's license to practice law in this state indefinitely with no possibility of reinstatement for six months from the date this opinion is filed. The suspension applies to "all facets of ordinary law practice." Iowa Ct. R. 34.23(3). Upon application for reinstatement, Barnhill must establish she has not practiced law during her suspension, has complied with the notification requirements of Iowa Court Rule 34.24, and has complied with the reinstatement procedures of Iowa Court Rule 34.25. Costs are taxed to Barnhill pursuant to Iowa Court Rule 36.24(1).

**LICENSE SUSPENDED.**

All justices concur except Appel, J., who takes no part.